**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CA-01167-SCT**

*ODELL PATTERSON, AND WIFE, FANNIE*
*PATTERSON AND FLOYD PATTERSON*

*v.*

*LIBERTY ASSOCIATES, L.P. AND CENTURY*
*MANAGEMENT COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/12/2003 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | AMITE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | T. PATRICK WELCH |
| ATTORNEYS FOR APPELLEES: | JACK W. LAND |
| | ANTHONY A. MOZINGO |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 12/09/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND DICKINSON, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     After a trial in which the jury found that the plaintiffs, Odell and Fannie Patterson, had suffered damages in the amount of $ 0, the circuit court entered a take-nothing judgment consistent with the jury verdict. Once the circuit court had entered an order denying the plaintiffs' motions for a judgment notwithstanding the verdict, a new trial and an additur as well as a motion for reconsideration, the plaintiffs timely appealed to this Court.     Finding no reversible error, we affirm the final judgment of the Circuit Court of Amite County.

**FACTS AND PROCEEDINGS IN THE TRIAL COURT**

¶2.     The facts of this case are basically without dispute.   Odell and Fannie Patterson had

lived since 1995 in Liberty Place Apartments, owned and operated by Century Management

Company and Liberty Associates, L.P., under a rent assistance arrangement through Rural

Development (RD) (formerly known as Farmers Home Administration) and the Internal

Revenue Service (IRS). The rent assistance program operates under regulations established by

RD and the IRS and provides assistance to applicants whose income is below an established

income level.   Odell suffered a stroke in 1995, is unable to communicate, and requires around-

the-clock bed care.

¶3.     The Pattersons were certified to live in Liberty Apartments located in Liberty,

Mississippi.    As was the practice, the Pattersons were submitted a one-year lease for 2002.

The lease was executed by Odell and Fannie as tenants and by Joyan Hughes on behalf of the

landlord, which according to the lease was Liberty Associates.[1]   The term of the lease was from

January 1, 2002, through December 31, 2002.[2]   The lease required a thirty-day written notice

of termination.   On February 6, 2002, Joyan Hughes, who was also the apartment manager,

informed Fannie that the Pattersons' income exceeded the maximum amount allowable to

maintain eligibility as residents at Liberty Apartments and that they would thus have to move

---

[1]In the lease, the tenant is listed as Odell Patterson, even though the lease is purportedly signed by Odell Patterson as tenant, and Fannie Patterson as co-tenant.  However, it appears that the same person signed for both Odell and Fannie, and in comparing the signatures with the signature of Fannie appearing on other documents which were offered into evidence, it would appear that Fannie signed the lease for both herself and Odell.  This would be consistent with the assumption that Odell was most likely unable to sign his name due to his incapacitation.  In any event, the validity of the lease is not at issue today.

[2]The blanks were filled in, in longhand, indicating the term of the lease was to begin on January 1, 2002, and end on December, *2003*.  This is clearly an error since the terms of the lease clearly set out that the lease period is for one year, and this fact is supported by the record in this case.  Again, there is no dispute concerning the one-year lease.

out at the end of the year. This advice by Hughes was clearly wrong inasmuch as she failed to take into consideration an IRS regulation that is commonly referred to as the "once qualified always qualified" rule which would allow the Pattersons to stay notwithstanding an income increase. In fact, Hughes had just attended a managers' meeting earlier that day at which the RD and IRS regulations and income limits were discussed, including the "once qualified, always qualified" rule. On February 15, 2002, Hughes repeated what she had previously told Fannie in the presence of Beth Wicker, Odell's nurse, and a social worker, Cynthia McGehee. Wicker and McGehee offered Fannie assistance in relocating, a service regularly performed by them through their employer, Southwest Mississippi Planning and Development District Medicaid Waiver Program. Their written notes of the conversation indicate that Fannie had "a year to decide" and that the Pattersons had "two acres of land in the country that she could put a trailer or perhaps a house."

¶4. At some point, Fannie went to Southwest Home to purchase a mobile home, but was turned down because of her credit. On March 15, 2002, Floyd Patterson, an adult child of the Pattersons, deeded to his parents two acres of land in Amite County. This property had been previously deeded to Floyd by Odell and Fannie prior to their moving into Liberty Apartments in 1995. On that same day, Fannie and Floyd signed the necessary papers to finance a thirty-year mortgage for a home to be constructed on the two acres of land by Jim Walter Homes of McComb. These papers contained a Notice of Cancellation, giving Fannie the right to cancel the transaction at any time prior to midnight on March 19, 2002. Additionally, Jim Walter had

3

a company practice which allowed Fannie the right to cancel the home purchase at any time prior to the concrete footing being poured.[3]

¶5. On March 20, 2002, Cheryl Jacobs, the general manager for Century and Liberty Associates, along with Hughes, performed the quarterly inspection of the Pattersons' apartment as required by RD. On this day, neither Hughes nor Fannie mentioned to Jacobs that Fannie had previously been told by Hughes that her lease would not be renewed. However, sometime in June, 2002, Fannie relayed a message to Michael Perry of RD that she wanted to "curse him out"for making her move. After learning from Fannie that Hughes told her that she would have to move, Perry called Jacobs. Jacobs was not aware of what Hughes had previously told Fannie, so Jacobs called Hughes. Within twenty minutes of the conversation between Fannie and Perry, Hughes apologized to Fannie and admitted that she had made a mistake. It is without question that under the IRS "once qualified, always qualified" rule, the Pattersons did not have to move from Liberty Apartments due to an income increase.

¶6. Odell, Fannie, and Floyd Patterson commenced this negligence action by filing a complaint against Century and Liberty on July 30, 2002, and an amended complaint was filed on August 6, 2002. In the amended complaint, the Pattersons alleged, inter alia, that the negligent acts of the defendants had caused the Pattersons to suffer financial damages in an amount of not less than $150,000, and had caused Fannie to suffer "severe mental anguish, depression and distress" in an amount of not less than $500,000. The record reveals that the Pattersons' claim for damages included: $172,404, representing the total amount of the promissory note (including interest over the life of the thirty-year mortgage) with Jim Walter

---

[3]The concrete footing was poured on April 5, 2002.

Homes; $374.49 for the purchase of an electric range; $588.48 for the purchase of a refrigerator; $663.76 for the purchase of a washer/dryer; $2,033.0 for the installation of a septic tank system; $1,200 for painting and woodwork; $2,153.63 for flooring; $123.05 for the installation of a gas heater in Odell's bedroom; $110.21 for an electrical connection to the well pump; $15.60 for the difference between cable and satellite service; and $801.40 per year for thirty years for home insurance. After the suit was commenced in late July, Odell and Fannie Patterson moved into their new home in August, 2002.

¶7. This case was tried before a jury in Amite County. After the Pattersons had rested their case-in-chief, the defendants moved for a directed verdict and although the motion for directed verdict was denied as to the claims of Odell and Fannie, the trial court granted the motion for a directed verdict as to the claims of Floyd Patterson, and a final judgment was subsequently entered dismissing Floyd's claims with prejudice. After the defendants presented evidence and rested their case-in-chief, the trial court instructed the jury, inter alia, that the defendants were negligent in telling Fannie that she and Odell would have to move from Liberty Apartments. Thus, the sole issue presented to the jury was what damages, if any, were sustained by the Pattersons as a proximate cause of the defendants' negligence. In fact, the trial court, via Jury Instruction No. 14 (Court's Instruction C-1), instructed the jury that the defendants were negligent and that if the jury found from a preponderance of the evidence that Odell and Fannie had sustained damages as a proximate result of such negligence, then the jury would so find by its verdict the appropriate amount of damages. However, in the same instruction, the jury was also instructed that if it found that Odell and Fannie had suffered no damages as a proximate result of the defendants' negligence, then the jury would so find by its verdict. In due course,

the jury returned with its handwritten verdict as follows: "We the jury, find that the plaintiffs sustained no damages." The trial court subsequently entered its final judgment consistent with the jury verdict, dismissing the claims of Odell and Fannie, with prejudice.

¶8. Upon the denial of post-trial motions, the plaintiffs timely appealed to this Court arguing that the verdict was against the overwhelming weight of the evidence and that the trial court erred by refusing to grant their post-trial motions as to damages. On the other hand, the defendants argue that the plaintiffs failed to mitigate their damages and that the purchase of a home with a thirty-year mortgage was not a reasonably foreseeable consequence of the defendants' negligence in erroneously informing Fannie that she and Odell would have to move from Liberty Apartments.

**ANALYSIS**

¶9. We must first address the procedural posture of this case. At the close of the plaintiffs' case-in-chief, the trial court directed a verdict in favor of the defendants as to Floyd's claims and after the trial, a judgment was entered consistent with the trial court's actions. The record reveals that the plaintiffs thereafter filed post-trial motions, and even though Floyd's name remained in the style of the case, the body of the motion requested post-trial relief only in behalf of Odell and Fannie. Likewise, the plaintiffs' motion requesting the trial court to reconsider its initial ruling on the post-trial motions again left Floyd's name in the style of the case, but requested reconsideration only in behalf of Odell and Fannie. The trial court's order denying post-trial motions, including the motion for reconsideration, includes Floyd's name in the style and makes reference in the body of the order only to "the plaintiffs." The notice of appeal contains the name of Floyd, Odell and Fannie both in the caption and in the body of

6

the notice. We thus consider this appeal as to Odell, Fannie, *and* Floyd, although the Pattersons, in their briefs, make little mention of Floyd or his claims.[4] The focus of the briefs is an attack on the jury verdict and the trial court's failure to grant post-trial motions as to an additur or a new trial on damages.

¶10.    In turning now to the issues raised on appeal, we combine them for discussion purposes. Succinctly stated, we must now determine (1) whether the jury's verdict was against the overwhelming weight of the evidence, and (2) whether the trial court erred in denying the plaintiffs' motion for an additur, or in the alternative, for a new trial on damages.

¶11.    The applicable standard of review is set forth in *Venton v. Beckham,* 845 So.2d 676, 684 (¶¶ 26-27) (Miss. 2003) (citing *Wal-Mart Stores, Inc. v. Johnson*, 807 So.2d 382, 389 (Miss. 2001)):

> Where an appellant challenges a jury verdict as being against the overwhelming weight of the evidence or the product of bias, prejudice or improper passion, this Court will show great deference to the jury verdict by resolving all conflicts in the evidence and every permissible inference from the evidence in the appellee's favor. *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n*, 560 So.2d 129, 131 (Miss.1989). "Only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Herrington v. Spell*, 692 So.2d 93, 103-04 (Miss.1997).

---

[4]We can quickly conclude from the record and the law that the trial judge quite appropriately granted a direct verdict in favor of the defendants, at the close of the plaintiffs' case-in-chief, as to Floyd's claims. The standard of review for a directed verdict and for a denial of a judgment notwithstanding the verdict is the same – whether reasonable jurors from the evidence could not have arrived at a contrary verdict. *Am. Fire Protection, Inc. v. Lewis*, 653 So.2d 1387, 1390-91 (Miss. 1995). The trial court's reasoning in granting the directed verdict consumed more than a page in the transcript. The trial court was correct in finding that there was no evidence as to causation regarding Floyd's damages. No reasonable juror could have differed on that issue.

¶12. The evidence at trial revealed that this mature couple (Fannie was 63 years old, and Odell was 72 years old) held a one-year lease from January 1 to December 31, 2002. On February 6, 2002, and again on February 15, 2002, the defendants, through Joyan Hughes, negligently told Fannie that she and her bed-ridden, totally disabled husband would have to move out of their apartment by December 31, 2002. In March, 2002, with nine and one-half months still remaining on their lease with Liberty Apartments, Fannie signed a thirty-year mortgage for the purchase and construction of a new home. Fannie learned in June, 2002, that she and her husband would not be required to move from Liberty Apartments.

¶13. The burden of proving damages rests upon the plaintiffs. *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 740 (Miss. 1999). The Pattersons claim that they have presented uncontroverted evidence of their damages. While it is true that they have presented evidence concerning the expenditures made in connection with the purchase of the new home, and while it is true that the defendants were unquestionably negligent, the jury acted within its province from the evidence before it, when the jury found that the Pattersons had suffered no damages *as a proximate result of the defendants' negligence*.

¶14. The elements of a negligence action are well-settled in Mississippi. A plaintiff in a negligence suit must prove by a preponderance of the evidence (1) duty, (2) breach of duty, (3) causation, and (4) injury. *Miss. Dep't of Transp. v. Cargile*, 847 So.2d 258, 262 (Miss. 2003). To recover, a plaintiff must prove causation in fact and proximate cause. *Jackson v. Swinney*, 244 Miss. 117, 123, 140 So.2d 555, 557 (1962). "Proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred." *Delahoussaye v. Mary*

*Mahoney's, Inc.*, 783 So.2d 666, 671 (Miss. 2001). We have observed that in order for a person to be liable for an act which causes injury, "the act must be of such character, and done in such a situation, that the person doing it should reasonably have anticipated that some injury to another will probably result therefrom." *Mauney v. Gulf Ref. Co.*, 193 Miss. 421, 9 So.2d 780, 780-81 (1942). "Foreseeability is an essential element of both duty and causation." *Delahoussaye*, 783 So.2d at 671.

¶15.    Given their age and Odell's condition, it was not reasonably foreseeable that this couple living in the Liberty Apartments under a federally approved rent assistance program  would sign a $172,404 deed of trust (or even have the means to commit to such a financial arrangement) in order to purchase a newly constructed home as a result of the negligent act of the apartment manager.  The Pattersons had only a one-year leasehold interest in the property. Moreover, the lease's thirty-day termination provision restricted the Pattersons' rights to remain on the property to a maximum of thirty days. However, since the mistake was discovered in June and Liberty/Century had not yet provided the Pattersons with the required written notice, a jury could reasonably find that the damages as claimed by the Pattersons are too remote, improbable, or extraordinary.   Discovery of the mistake in June provided all parties a considerable amount of time to remedy the situation by the end of December.  The learned trial judge was liberal in granting jury instructions to assure that the jury was fairly instructed on all pertinent issues.  Included in these instructions was Instruction No. 12 (No. P-17), which informed the jury that the Pattersons' duty to mitigate their damages did not arise until the Pattersons' became aware of the fact (or reasonably should have known) that they had damages which they needed to mitigate.  The jury was also informed via Jury Instruction No. 7 (No. P-

9

10), that it was within the jury's province to award damages for, among other things, Fannie's mental anguish, depression, and distress.

¶16. Our decision today to affirm the trial court judgment entered consistent with the jury's verdict is based on well established law which requires us to give great deference to the jury's verdict and the trial judge's refusal via post-trial motions to set aside the jury verdict or award a new trial. In *Culbreath v. Johnson*, 427 So.2d 705, 708 (Miss. 1983), we stated:

> The trial judge saw these witnesses testify. Not only did he have the benefit of their words, he alone among the judiciary observed their manner and demeanor. He was there on the scene. He smelled the smoke of battle. He sensed the interpersonal dynamics between the lawyers and the witnesses and himself. These are indispensable.

*Id.* at 708.

¶17. Although *Culbreath* involved a chancery court action, we have applied *Culbreath*'s reasoning in circuit court cases involving juries. In a circuit court criminal case, in citing *Culbreath*, we stated:

> Were we to substitute our view [of the reasonable inferences that may be drawn from] the facts for the ... [jury's], one thing could be said with certainty: the chances of error in any findings we might make would be infinitely greater than is the case where those findings are made by ... [twelve citizens, peers of the defendant, who are on the scene and smell the smoke of the battle].

*Burge v. State*, 472 So.2d 392, 396 (Miss. 1985). Finally, in the civil arena, we have stated:

> We emphasize that our powers on appellate review are even more restricted. Our institutional role mandates substantial deference to the jury's findings of fact and to the trial judge's determination whether a jury issue was tendered. When a verdict is challenged via appeal from denial of a motion for j.n.o.v., we have before us the same record the trial judge had. We see [on paper] the testimony the trial judge heard. We do not, however, observe the manner and demeanor of the witnesses. We do not smell the smoke of the battle. Cf. *Culbreath v. Johnson*, 427 So.2d 705, 708 (Miss. 1983). The trial judge's

10

determination whether, under the standards articulated above, a jury issue has been presented, must per force be given great respect here.

*City of Jackson v. Locklar*, 431 So.2d 475, 478-79 (Miss. 1983).

¶18.    For the foregoing reasons, we unhesitatingly find that the jury's verdict was not against the overwhelming weight of the evidence.

¶19.    When confronted with a request to disturb a trial court's ruling on a motion for an additur, we have stated:

> In reviewing a trial court's grant or denial of an additur, this Court's standard of review is limited to an abuse of discretion. *Rodgers v. Pascagoula Pub. Sch. Dist.*, 611 So.2d 942, 945 (Miss. 1992); *State Highway Comm'n v. Warren*, 530 So.2d 704, 707 (Miss. 1988). The party seeking the additur bears the burden of proving his injuries, loss of income, and other damages. We view the evidence in the light most favorable to the defendant, giving him all favorable inferences that may be reasonably drawn therefrom. *Rodgers*, 611 So.2d at 945; *Odom v. Roberts*, 606 So.2d 114 (Miss. 1992); *Copeland v. City of Jackson*, 548 So.2d 970, 974 (Miss. 1989); *Hill v. Dunaway*, 487 So.2d 807, 811 (Miss. 1986). Awards set by jury are not merely advisory and generally will not be "set aside unless so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Rodgers*, 611 So.2d at 945 (*citations omitted*). The amount of damages awarded is primarily a question for the jury. *South Cent. Bell Tel. Co. v. Parker*, 491 So.2d 212, 217 (Miss. 1986); *Edwards v. Ellis*, 478 So.2d 282, 289 (Miss. 1985). "Additurs represent a judicial incursion into the traditional habitat of the jury, and therefore should never be employed without great caution." *Gibbs v. Banks*, 527 So.2d 658, 659 (Miss. 1988).

*Maddox v. Muirhead*, 738 So.2d 742, 743-44 (Miss. 1999).

¶20.    The applicable statute is Miss. Code Ann. § 11-1-55 (Rev. 2002), which states in pertinent part:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of

the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.

¶21.    One could conceivably argue in today's case that since the jury found that "the plaintiffs had sustained no damages," this statute would not apply since the express language of the statute authorizes our trial and appellate courts to grant an additur or remittitur in cases where "money damages were awarded."   The jury in the case sub judice, by its finding that the plaintiffs had suffered "no damages," found the equivalent of "0" damages.   However, we have in the past addressed this issue in cases involving verdicts in the amount of "0" damages. *See Horton v. Am. Tobacco Co.*, 667 So.2d 1289, 1292-93 (Miss. 1995) (jury was given a comparative fault instruction, and the verdict which was obviously based on a finding of 100% fault on the part of the decedent was justified by the evidence); *Johnson v. Fargo*, 604 So.2d 306, 309 (Miss. 1992) (trial court committed error in denying motion for new trial on damages or additur after a jury verdict assessing damages at zero dollars and, thus, case reversed for a new trial on damages only);[5] *Russell v. Lewis Grocer Co.*, 552 So.2d 113, 115-17 (Miss. 1989) (affirmed trial court's judgment on a jury verdict of zero dollars after the trial court had instructed the jury that the defendant was negligent).

¶22.    We have already found that the jury's verdict was not against the overwhelming weight of the evidence.   In specifically addressing the additur/new-trial-on-damages issue, we come to the same conclusion.   We are not required to get into the heads of the jurors and determine the specific reason for their verdict. Without question, however, when we view the evidence

---

[5]This case is distinguishable from today's case because in *Johnson,* the trial judge admitted at trial that the inadmissible testimony had a damaging effect on the jury's verdict.  604 So.2d at 312.  Also, in the case sub judice, we are not confronted with an issue of inadmissible testimony.

in the case sub judice in the light most favorable to the defendants and afford to them all favorable inferences that may be reasonably drawn from the evidence offered at trial, we reach the unmistakable conclusion that there was more than sufficient evidence before the jury to justify a finding that the plaintiffs had either failed to mitigate their damages, or that their purchase of a home with a long-term mortgage was not a reasonably foreseeable consequence of Hughes's negligence in telling Fannie that she and her husband would have to move from the apartment complex, or both. Stated differently, the jury was justified from the evidence in finding that the plaintiffs did not sustain any damages "as a proximate result of [the defendants'] negligence." In **Russell**, we found that the evidence supported the jury's verdict in the amount of zero damages, notwithstanding the fact that the trial court instructed the jury that the defendant was negligent. We likewise find today, for the reasons already articulated, that the evidence in the case sub judice supported the jury's verdict that the plaintiffs had suffered "no damages." The jury's verdict is certainly not outrageous, and it certainly is beyond our authority to disturb. **Maddox**, 738 So.2d at 743-44.

¶23. We thus find that the trial court was eminently correct in denying the plaintiffs' post-trial motion for an additur, or alternatively, for a new trial on damages.

## CONCLUSION

¶24. We have carefully reviewed this record and applied our well-settled case law in methodically, logically and reasonably arriving at the decision we make in today's case. To conclude otherwise would be a judicial abrogation of basic tort law regarding the necessity of proving by a preponderance of the evidence the elements of duty, breach of duty, causation and injury. The defendants were wrong when they, through their apartment manager, instructed

13

Fannie Patterson that she and her disabled husband would have to move from the apartment complex at the end of the year. The trial judge told the jury just that in the jury instructions, meaning that the jury had before it only the issue of damages. But the trial judge also quite appropriately via a properly worded jury instruction informed the jury that it could award damages to Fannie and Odell only if the jury found from a preponderance of the evidence that the Pattersons' damages were sustained "as a proximate result of such negligence." The jury and the judge observed the witnesses and their demeanor – we did not. We refuse to become a thirteenth juror and substitute our judgment for that of the jury when reasonable jurors could differ on the verdict from the evidence presented.

¶25. Based upon the foregoing analysis, we find from the record before us and the applicable law that the jury verdict was not against the overwhelming weight of the evidence and that the trial court's denial of an additur, or alternatively, a new trial on damages was not in error. We thus affirm the Amite County Circuit Court's final judgment entered consistent with the jury's verdict finding that the Pattersons suffered no damages as a proximate result of the defendants' negligence.

¶26. **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, GRAVES AND DICKINSON, JJ., CONCUR. DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**

14